**Earl H. MILLER, Plaintiff,**

v.

**CHAMPAIGN COMMUNITY UNIT SCHOOL DISTRICT, No.4, Defendant.**

No. 95–2286.

United States District Court, C.D. Illinois, Urbana Division.

Dec. 22, 1997.

---

**8.** This argument was submitted in Paredes' motion to supplement his § 2255 motion.

Sandra J. Holman, Illinois Education Ass'n, Springfield, IL, for Plaintiff.

Edward Druck, Andrea R. Waintroob, Franczek Sullivan Mann Crement Hein Relias PC, Chicago, IL, for Defendant.

## ORDER

BAKER, Senior District Judge.

In this case the court must decide whether an employer ordered psychiatric examination and a related letter are discriminatory within the meanings of the Americans With Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, and Title VII of the Civil Rights Act (Title VII), 42 U.S.C. § 2000e *et seq.* The plaintiff, Earl Miller, is employed by the defendant, Champaign Community Unit School District No. 4 (school district) as the head custodian at Booker T. Washington Elementary School. On November 23, 1993, the school district placed Miller on a paid leave of absence and required him to undergo a psychiatric examination. Following the psychiatric evaluation, he returned to work on January 18, 1994, and has continued to work as the head custodian at Booker T. Washington School. Miller's second amended complaint alleges violations of the ADA and Title VII. The defendant has moved for summary judgment. The court now grants summary judgment to the defendant.

### Summary Judgment Standard

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Covalt v. Carey Canada, Inc.,* 950 F.2d 481 (7th Cir.1991). On review, the district court views "all evidence in the light most favorable to the party opposing summary judgment." *Wilson v. Williams,* 997 F.2d 348 (7th Cir.1993). However, Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-

moving party there is no 'genuine' issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

## Facts

These are the uncontested facts of the case. Earl Miller was hired by the Champaign School District in 1985. In May, 1990, he was promoted to the position of head custodian at Washington Elementary School. In August, 1993, Dr. Arnetta Rodgers became the principal of Washington School and Miller's supervisor. During the 1993–94 school year, in Miller's perception, a series of incidents occurred that led him to believe people at the school were trying to get rid of him; that people were trying to make him lose his job.

During the fall of 1993, Dr. Rodgers sent Miller a series of memos regarding his job performance. Summarized, these memos include: (1) an August 30, 1993 memo about an unlocked door; (2) an October 18, 1993 memo about Miller's inappropriate assumption of authority over the building's extermination program; his failure to clean-up sidewalk graffiti; and the fact that it took him several days to comply with her directive to put certain notices on entrance doors to the school; (3) an October 26, 1993 memo regarding the building being left unlocked on October 20; and (4) a November 2, 1993 memo note regarding Rodgers' concerns about Miller's job performance. Additionally, from October, 1993, until November 9, 1993, Dr. Rodgers required Miller to keep a daily log of his activities. She ended this requirement after November 9, 1993.

On October 27, 1993 an altercation occurred between Miller and a teacher, Bobby Hunt. Miller allegedly told Hunt, "the fucking door was open". Hunt reported the incident to Dr. Rodgers. Around this same time Miller told Hunt in conversation that people were trying to get rid of him. Miller met with Dr. Rodgers on November 2, 1993, and told her that someone was leaving the door unlocked.

During the morning of November 18, 1993, Miller asked Dr. Rodgers to accompany him to the school kitchen. He showed her a garbage can which had a screw in the bottom. He told her someone had put the screw in there to cause leakage and to interfere with Miller's doing his job. Miller told Rodgers he wanted to point out other things that were going on in the building including someone unplugging the milk cooler at night. About a half hour following this discussion, school secretary Nancy Diedrich reported to Dr. Rodgers that Miller was acting strangely. Diedrich said that she had offered Miller some candy and that he had turned and walked away saying, "it's going to get taken care of; it's going to get taken care of." In his deposition, Miller explained that the "it's going to get taken care of" language was in essence his thinking out loud, and that he was referring to all the pranks going on. Diedrich states that she followed Miller asking for an apology, but that he ignored her and kept walking.

Later that same morning (November 18, 1993) Dr. Rodgers went to talk to Miller about cleaning shades. She asked Miller if he had gotten her memo on the subject. Miller said yes and walked away. Rodgers believed Miller was angry, upset, and rude. She asked him if something was wrong. Miller told her that a teacher, Scott Davis, "had peed on the floor of the boys' bathroom." He had gone to the building office to report it and the office personnel had all laughed. Miller led Rodgers to the restroom and showed her a wet spot on the floor. He said Davis' shoeprint was on the floor. Miller was agitated. Dr. Rodgers pulled Davis out of his classroom to discuss the matter. Davis denied urinating on the bathroom floor. As Davis and Rodgers were talking, Miller came up. All three went to the boys' bathroom. As they walked, Miller was agitated and muttering about the Bible, and about God punishing sinners, and about the devil.

In the early afternoon of that same day (November 18, 1993) Miller came to the office and told Diedrich he was going to lunch. Diedrich told Dr. Rodgers that Miller also said something about placing a booby trap in his office. Miller denies making the "booby trap" comment.

Dr. Rodgers contacted Joe Tomlinson, the District Director of Personnel. He told her to document the incidents and that he would seek further advice on what to do. Dr. Rodgers wrote a memo to Tomlinson which detailed some of Miller's behavior. Her memo concluded: "At this point, I am quite concerned about Mr. Miller's erratic behavior. I also wonder if I can trust him and I am concerned about my personal safety. I think that his attitude and behaviors on the job warrant immediate attention." Tomlinson set up a meeting on November 23 with Miller, Miller's Union representative, and Rodgers. The purpose of the meeting was to provide Miller with an opportunity to discuss the events of November 18.

Miller arrived at the November 23 meeting approximately 20 minutes late carrying his Bible. He was acting agitated and suspicious. He was angry because the meeting was held on his wedding anniversary. When he arrived he repeated several times that if the meeting had anything to do with discipline he didn't want any part of it. Tomlinson reviewed Dr. Rodgers' memo and asked Miller if it was accurate. Miller pointed his finger at Tomlinson and Rodgers and said that the Bible told him how these things should be handled, and that they were not being handled appropriately and that Dr. Rodgers needed to do something about her staff. The Union representative took Miller aside to talk to him alone. After the meeting resumed, Tomlinson told Miller he was on paid leave of absence pending a psychiatric examination

During his paid leave of absence, Miller was evaluated on December 22, 1993, by Lawrence Jeckel, M.D., a board certified psychiatrist. Dr. Jeckel reported to the school district that "Mr. Miller displayed the thinking of someone with a thought disorder, probably a variant of schizophrenia. I would not give him the diagnosis of schizophrenia at this time. Instead I would describe him as having a schizophreniform disorder, a thought disorder which has been in evidence for six months or less." Dr. Jeckel offered his opinion that "although Mr. Miller is not presently dangerous to himself and others, he does have paranoid psychotic symptoms which can predispose an individual to violent acting out. One choice would be to re-employ Mr. Miller with close monitoring of his behavior in order to protect everyone involved." Based on Dr. Jeckel's opinion, the school district returned Miller to work on January 18, 1994. Miller is still employed by the school district.

Tomlinson placed a January 14, 1994 letter in Miller's file, stating that, "insubordination, baseless accusations, threats to boobytrap any area of the school or similar behavior are not acceptable and will not be tolerated."

Miller filed a grievance protesting the psychiatric exam and Tomlinson's January 14, 1994 letter in his file. On January 25, 1996, an arbitrator ruled that the district had acted properly in requiring a psychiatric exam. The arbitrator further ruled that the Tomlinson January 14, 1994 letter was improper discipline and ordered the letter expunged from Miller's file. The district removed the letter.

Based on the above detailed uncontested facts, summary judgment is appropriate. It is difficult for the court to grasp exactly what Mr. Miller is complaining about. He was never fired. His leave of absence was a paid leave of absence. He is currently working for the defendant. The mild measures taken by the defendants were in no way discriminatory in violation of the ADA or Title VII. Certainly, on a common sense level, a school district has the responsibility to investigate agitated, paranoid, or "schizophreniform" behavior in one of its employees.

### The January 14, 1994 Tomlinson Letter

█ As a preliminary matter, the court notes that the January 14, 1994 Tomlinson letter does not support a case or controversy. The uncontested facts show that a letter dated January 14, 1994 and signed by Tomlinson was placed in Miller's file. The uncontested facts also show that upon a decision from a grievance arbitrator the letter was expunged from Miller's file on approximately January 25, 1996. The letter was expunged from Miller's file subsequent to the December 8, 1995 filing of this lawsuit in federal court.

Article III of the Constitution limits the jurisdiction of all federal courts to matters of actual case or controversy. U.S. Const. Art. III. This requirement has been interpreted by the Supreme Court to mean "injury in fact." "To satisfy the case or controversy requirement of Article III, which is the irreducible constitutional minimum of standing, a plaintiff must, generally speaking, demonstrate that he has suffered injury in fact, that the injury is fairly traceable to the actions of the defendant, and that the injury will likely be redressed by a favorable decision." *Bennett v. Spear*, —— U.S. ——, ——, 117 S.Ct. 1154, 1161, 137 L.Ed.2d 281 (1997). *See also, Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559–560, 112 S.Ct. 2130, 2136–2137, 119 L.Ed.2d 351 (1992); *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 469–474, 102 S.Ct. 752, 757–759, 70 L.Ed.2d 700 (1982).

■ Mootness is a corollary to the constitutional requirement of standing via injury in fact. The mootness doctrine requires a court to monitor its jurisdiction by weeding out claims that have become moot during the pendency of legal proceedings. "The case-or-controversy requirement subsists through all stages of federal judicial proceedings." *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477, 110 S.Ct. 1249, 1253, 108 L.Ed.2d 400 (1990). "It is not enough that a dispute was very much alive when suit was filed." *Id.* If an allegedly wrongful behavior stops during the pendency of the lawsuit, and cannot reasonably be expected to recur, the issue is moot and the court loses jurisdiction over that issue. *In re: Dow Jones & Co.*, 513 U.S. 1301, 115 S.Ct. 552, 130 L.Ed.2d 483 (1994).

In the instant case the issue of the January 14, 1994 Tomlinson letter is moot. The letter was expunged from Miller's file subsequent to the filing of this lawsuit. It is no longer relevant to this lawsuit. An expunged letter cannot possibly violate the ADA or Title VII. There is no remaining live controversy surrounding the letter. It cannot be the basis for any "injury in fact." It is a moot issue outside the jurisdiction of this court.

## Americans with Disabilities Act (ADA)

The ADA defines disability as: (A) A physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) A record of such impairment; or (C) Being regarded as having such an impairment. 42 U.S.C. § 12102(2). The ADA further provides that an employer "shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A).

■ In this case the "job-related or business necessity" language of § 12112(d)(4)(A) exonerates the school district from all forms of ADA liability. Since the psychiatric examination was job-related, it necessarily cannot be the result of either direct discrimination or discrimination based on improper assessment or "regarding" Miller as having a disability. The court holds that a psychiatric examination of Miller, based only on the uncontested facts, was "job-related and consistent with business necessity."

■ As a matter of law a psychiatric examination is "job-related and consistent with business necessity" when an elementary school employee shows even mild signs of "schizophreniform" behavior. Because elementary school personnel deal directly with very young children, it is appropriate for principals and other school supervisors to require medical/psychiatric follow-up to any and all allegations of paranoia or other mental disorder. This does not mean that such employees should be fired or discriminated against in any way. It does not mean that such employees are disabled; that is a separate and distinct question. The narrow ruling of this case is that a psychiatric examination is "job-related and consistent with business necessity" in any case where an elementary school employee exhibits paranoid or agitated behavior that causes the school administration to be concerned about

the personal safety of those in contact with the employee.

[redacted] "An employer may inquire into the ability of an employee to perform functions related to his job." *Miranda v. Wisconsin Power & Light Co.,* 91 F.3d 1011 (7th Cir. 1996). The ADA prohibits only medical examinations that are not job-related. The regulations state that the purpose of the prohibition, "is to prevent the administration to employees of medical tests or inquiries that do not serve a legitimate business purpose. For example, if an employee suddenly starts to use increased amounts of sick leave or starts to appear sickly, an employer could not require that employee to be tested for AIDS, HIV infection, or cancer unless the employer can demonstrate such testing is job related and consistent with business necessity." 29 C.F.R. § 1630.13(b). In direct contrast to the regulations' hypothetical AIDS test, an elementary school district is properly protecting its students and staff, and is therefore acting in a manner consistent with business necessity, when it requires a psychiatric examination of an employee who has exhibited paranoid, agitated and "schizophreniform" behavior.

[redacted] A secondary ADA issue is whether the defendant school district regarded Miller as disabled in violation of ADA, 42 U.S.C. § 12102(2)(C). The court finds that the "job-related and consistent with business necessity" language of the statute exonerates the district from liability for regarding Miller as disabled.

The "regarded as" disabled portion of this case is closely analogous to a recent district court case out of the Northern District of Indiana. *Rice v. Genova Products, Inc.,* 978 F.Supp. 813 (N.D.Ind.1997). In *Rice* the court granted summary judgment to a defendant in an ADA case. The *Rice* plaintiff was a truck driver who suffered from an illness that caused him periodically to pass out. As a result, he temporarily lost his DOT certification. The defendant employer required that he stop driving trucks and offered him a warehouse job. He refused the warehouse job and sued. The district court granted summary judgment to the defendant, and upheld the employer's decision to terminate the plaintiff.

[redacted] The *Rice* court viewed the entire ADA "regarded as" disabled issue as boiling down to whether the employer's stated job-related explanations of its actions were pretextual. "That is, even assuming that [the employer] perceived [the plaintiff] as having a disability, [the plaintiff] has failed to establish that the company's proffered reason for terminating him was pretextual." *Rice* at 818. Pretext can be analyzed as a threshold issue. Courts need not decide whether a plaintiff has alleged a *prima facie* case of discrimination, if it is easier to jump directly to "the dispositive issue of pretext." *Essex v. United Parcel Service, Inc.,* 111 F.3d 1304, 1309 (7th Cir.1997).

In Miller's case, his claim that the school district regarded him as being disabled fails because he has no support for the proposition that the district's valid job-related explanations are pretextual. The school district says it required Miller to undergo a psychiatric examination because it was necessary to do so in the course of the ordinary business of safely educating young children. Miller has failed to offer any evidence that the school district's stated reason is pretextual, and his claim under the ADA's "regarded as" disabled prong must fail.

*Title VII Religious Discrimination*

[redacted] The fact that Miller at times manifested agitation and paranoia through mutterings about God and the devil is not enough to make a religious discrimination claim under Title VII. Title VII prohibits employment discrimination based on an employee's "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a). Miller alleges that the decision to require him to undergo a psychiatric examination was improperly motivated by his religion. The uncontested facts listed above show that Miller intertwined religious rhetoric into his agitated and paranoid behavior. The uncontested facts do not show that the school district reacted to Miller's religious expressions in a discriminatory manner. In fact, religious animation is shown only on Miller's part, not on the defendant's part.

Alternatively, if for the purposes of summary judgment, the court assumes that by exhibiting paranoid behavior that is accompanied by mumbled religious rhetoric, Miller has offered some shred of evidence that the school district's decision was based in part on his religion, this is still not enough to make a case of religious discrimination. When ruling on motion for summary judgment, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). "A party needs more than a scintilla of evidence, however, to defeat summary judgment. In summary judgment cases, the non-movant must show that a discriminatory reason more likely motivated the employer's decision or that its proffered explanations are unworthy of credence." *Senner v. Northcentral Technical College,* 113 F.3d 750, 757–58 (7th Cir.1997) (quoting *Courtney v. Biosound,* 42 F.3d 414, 418 (7th Cir.1994)).

 Also alternatively, if for the purposes of summary judgment the court assumes that Miller's religious rhetoric was a partial motivation in the district's decision to require a psychiatric examination, that also is not enough to make a case of religious discrimination unless the district's legitimate business related explanations are pretextual. In the Seventh Circuit, once a plaintiff shows that an employment decision was motivated in part by an illegal motivation, such as religion, the defendant may avoid liability by proving it would have made the same decision in the absence of unlawful motivation. *Gleason v. Mesirow Financial, Inc.,* 118 F.3d 1134, 1141 (7th Cir.1997) (citing 42 U.S.C. § 2000e–2(m)). *See also, Geier v. Medtronic,* 99 F.3d 238, 241 (7th Cir.1996); *Troupe v. May Department Stores. Co.,* 20 F.3d 734, 737 (7th Cir.1994).

 In a mixed motive pretext case there is "a burden on the part of the employer to demonstrate that it would have taken the same action against the plaintiff even if the proscribed criterion had played no role in its decision." *Venters v. City of Delphi,* 123 F.3d 956, 973 (7th Cir.1997). "The persuasiveness of that showing will normally be for the finder of fact to assess, unless the court can say without reservation that a reasonable finder of fact would be compelled to credit the employer's case on this point." *Venters,* 123 F.3d at 973. This court can say without reservation that a reasonable finder of fact would be compelled to credit the school district's reason for requiring a psychiatric examination. The school district's reason was the proper job-related reason of testing whether Miller's paranoia and agitation could lead to violence or other behavior inappropriate in an elementary school setting.

*Conclusion*

School districts and school principals are under considerable pressure to screen and monitor the behavior of all employees. If a school district fails to monitor paranoid and agitated behavior in an employee, and harm to a child results, the school district could be legally liable for that harm. *See, Mueller v. Community Consolidated School District,* 287 Ill.App.3d 337, 222 Ill.Dec. 788, 678 N.E.2d 660 (Ill.App. 1st Dist.1997) (listing elements of negligent hiring and negligent supervision in context of school employee). *But cf.,* 745 ILCS § 10/1–101 *et seq.* (Illinois Local Governmental and Governmental Employees Tort Immunity Act). Negligent hiring and supervision on the part of the school is treated harshly by the courts because of the importance of educating youth in a safe environment.

Given the school district's legal duties of supervision, and in particular, Dr. Arnetta Rodgers' responsibilities as principal of an elementary school, all the actions taken *vis a vis* Miller were appropriate. A district and a principal could do no less than require a medical/psychiatric examination of an elementary school custodian after receiving reports of paranoid and agitated behavior. Neither Title VII nor the ADA interdict the appropriate supervision of Miller shown in this case.

IT IS THEREFORE ORDERED THAT the defendant's motion for summary judgment (docket # 23) is granted.

The clerk is directed to enter judgment in favor of the defendant and against the plaintiff. The parties shall bear their own costs.